# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ABDUL H. JABARIN,     :       **Chapter 7**

                          :

       **Debtor.**         :       **Bky. No. 07-10268 ELF**

                          :

                          :

# O P I N I O N

**BY:   ERIC L. FRANK, U.S. BANKRUPTCY JUDGE**

## I.

On January 14, 2007, Abdul H. Jabarin ("the Debtor") filed a petition under chapter 7 of the Bankruptcy Code. On February 28, 2008, he filed a motion to voluntarily dismiss the case without prejudice ("the Motion") because he believes that his decision to file was uninformed and therefore, a "mistake."

At the outset of the case, the Debtor did not disclose certain prepetition asset transfers he made to his wife and children. He contends that this omission occurred due to "potential confusion caused by language differences" between him and his counsel. Debtor's Mem. at 1. As a result of the communication difficulties, he was not counseled regarding the potential impact a bankruptcy filing might have on the transferred assets he hoped to reserve for his family's use. Having now revealed these transactions, the Debtor fears that the chapter 7 trustee will attack them as fraudulent transfers.

The Debtor argues that his decision to seek bankruptcy relief was not based on appropriate counseling and that he be permitted to voluntarily dismiss this case. He contends that, in these circumstances, dismissal will not unduly prejudice his creditors as it will merely put

them in a "similar position as if he had not filed." Debtor's Mem. at 1, 2.

Both the chapter 7 trustee, Arthur P. Liebersohn ("the Chapter 7 Trustee"), and the United States Trustee ("the UST") oppose the Motion. They assert that the Debtor has failed to meet his statutory burden of establishing "cause" for dismissal. Essentially, they argue that creditors would be unduly prejudiced if this case were dismissed. They observe that, at this point, the Debtor has enjoyed the benefits of the automatic stay for well over one (1) year and express concern that certain creditors' claims may be affected by the statute of limitations if this case were dismissed. They further contend that creditors deserve to rely upon the anticipated benefit that may be achieved by a trustee who is motivated to investigate and attempt to recover the exposed assets on their behalf.

On April 2, 2008, a hearing was held at which counsel presented argument. At the conclusion of argument, and in lieu of immediately proceeding to an evidentiary hearing, the parties agreed that I should treat the opposition of the Chapter 7 Trustee and UST to the Debtor's Motion as though they were demurrers. I acceded to the parties' request and took the matter under advisement.[1] Subsequently, I determined that resolution of the Motion necessitated the development of an evidentiary record and by Order dated July 15, 2008, scheduled an evidentiary hearing for August 27, 2008. The hearing was held and concluded that day. The Debtor was the only witness to testify at the hearing. Both sides introduced documents into

---

[1]    The Debtor, the UST and the Chapter 7 Trustee filed post-hearing memoranda of law on April 10, 15 and 24, 2008, respectively. See Docket Entry Nos. 71, 72 and 73.

evidence.[2]

For the reasons set forth herein, I will deny the Debtor's Motion.


## II.

Based on the evidentiary record, I make the following findings of fact:


### The Debtor's Background

1. The Debtor is sixty-two (62) years old and was born in Jerusalem, (now) Israel. He came to the United States in 1975.

2. The Debtor's native language is Arabic. He speaks and comprehends English to a sufficient degree that he was able to testify at trial, but his facility with the language (i.e., reading, writing and verbal communication) is somewhat limited and imperfect.

3. The Debtor has been married to Hana Jabarin ("Mrs. Jabarin") since 1982. They have six (6) children, aged 25, 23, 22, 18, 14 and 3.

4. After arriving in the United States, the Debtor lived in the Washington D.C. area until August 2005.

5. While residing in the Washington D.C. area, the Debtor worked in "carry out" restaurants, working his way up from a dishwasher to a cook.

6. At some point, the Debtor and his wife purchased a residence at 3616 Dannys Lane in Alexandria, Virginia ("the Virginia Property").

---

[2]      The Debtor introduced D-1 (a copy of letter from the office of the UST dated February 26, 2007, requesting certain information from the Debtor). The Chapter 7 Trustee introduced T-1 (the Debtor's original Schedule F) and T-2 (the Claims Register for the Debtor's bankruptcy case).

7.    The Debtor and Mrs. Jabarin owned the Virginia Property jointly as tenants by the entireties.

8.    In early 2005, the Debtor experienced health problems that caused him to stop working.  He

       applied for and eventually received Social Security disability benefits in 2007.


**Sale of the Virginia Property and Disposition of the Proceeds**

9.    On August 2, 2005, the Debtor and Mrs. Jabarin sold the Virginia Property.

10.   The net proceeds from the sale of the Virginia Property were $410,804.83.

11.   The Debtor and Mrs. Jabarin divided the sale proceeds.  The Debtor took one-half of the

       proceeds in his own name and Mrs. Jabarin did likewise.

12.   Mrs. Jabarin used her half of the proceeds to purchase real property (specifically, a duplex)

       titled in her name alone, located at 2237 Strahle Street, Philadelphia, PA ("the Philadelphia

       Property").  After purchasing the Philadelphia Property, Mr. and Mrs. Jabarin resided there

       with their children.

13.   At or around the time of the sale of the Virginia Property, the Debtor and Mrs. Jabarin

       discussed separating as a couple.  However, except for a short period of time (perhaps only

       a few weeks) between the sale of the Virginia Property and the purchase of the Philadelphia

       Property, they continued to reside together.  During that short period of separation, Mrs.

       Jabarin resided with her parents in Virginia while the Debtor stayed with his brother in

       Philadelphia.

14.   Approximately three (3) months after the sale of the Virginia Property, the Debtor, Mrs.

       Jabarin and some of their children traveled to Jerusalem and stayed with family.

15.   Prior to the filing of the bankruptcy case, the Debtor and his family returned to the United

4

States and resided in the Philadelphia Property.

16.   With his one-half of the sale proceeds derived from the Virginia Property, the Debtor:

    a.   transferred $50,000.00 to his wife to assist her in purchasing the
        Philadelphia Property;

    b.   placed $42,000.00 in trust in his wife's name for the support of his
        children;

    c.   paid $20,000.00 for certain legal expenses relating to criminal charges that resulted
        in the incarceration of one of his sons;

    d.   reimbursed himself the $20,000.00 he had paid to "fix up" the Virginia Property
        to prepare it for sale; and

    e.   paid for living expenses and his family's travel and lodging as the family
        moved back and forth from Philadelphia to Jerusalem.

17.   The Debtor says that he made the expenditures referenced in paragraphs 16a. and 16b.

because:

    a.   he and his wife were contemplating a separation;

    b.   he was and is disabled; and

    c.   at the time, he had no foreseeable source of future income, and wished
        to ensure future support and shelter for his children.

18.   The Debtor has not been employed since he and his wife sold the Virginia Property in

August 2005.

19.   The Debtor claims that by the time he and his family returned to the United States, he had

exhausted all of the money he received from the sale of the Virginia Property.

**The Initial Chapter 7 Phase of the Case**

20.   On January 14, 2007, the Debtor filed a voluntary petition under chapter 7 of the

Bankruptcy Code.

21.    On January 16, 2007, the Chapter 7 Trustee was appointed.

22.    In his initial Statement of Financial Affairs ("the SOFA") that accompanied his bankruptcy

petition, the Debtor did not disclose the transfer of his interest in the Virginia Property.[3]

See Docket Entry No. 1.  The Debtor answered "None" in response to ¶10 of the SOFA,

which requests that the Debtor:

> List all other property, other than property transferred in the ordinary course of the
> business or financial affairs of the debtor, transferred either absolutely or as security
> within two years immediately preceding the commencement of this case.

23.    In his original Schedule A, B, D, E, and amended Schedule F, see Docket Entry Nos. 1, 13,

the Debtor disclosed that he:

   a.    owns no real property;

   b.    has only $2,940.00 in exempt personal property;

   c.    has no secured or priority debt;

   d.    and owes $96,445.58 in unsecured, nonpriority debt.[4]

24.    In his original Schedule I and J, see Docket Entry No. 1, the Debtor also disclosed that:

   a.    he is disabled and his income is $1,250.00, consisting of $500.00 in food stamps
         and $750.00 from Mrs. Jabarin's rental income; and

---

[3]    In addition to the evidence presented at the hearing, I have also taken judicial notice of certain filings made in the bankruptcy case for the purposes of ascertaining timing and providing chronological context.  See Fed. R. Evid. 201;  In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998);  See also In re Indian Palm Assocs., Ltd., 61 F.3d 197, 205 (3d Cir. 1995).

[4]    The Debtor's original Schedule F set forth $70,841.91 in unsecured claims.  See Docket Entry No. 1.  The higher amount in the text above was disclosed in the Debtor's Amended Schedule F filed on March 17, 2007.

   b. his monthly living expenses total $1,489.00, exceeding his income by
    $239.00/monthly.

25. On March 18, 2007, the Debtor filed an Amended SOFA, which included the August 2,

  2005 transfer of the Virginia Property and the Debtor's receipt of $205,401.91 in sale

  proceeds.  <u>See</u> Docket Entry No. 14.

26. The Amended SOFA also disclosed the Debtor's interest in South Fern Street, Inc., a

  business that operated from 1998 to 2005 and that was described as a "hot dog cart."  <u>See</u>

  <u>Id.</u> at ¶18.[5]

27. On April 6, 2007, the Chapter 7 Trustee filed an uncontested motion to extend the time to

  file a motion to dismiss and/or a complaint to deny a discharge, which the court granted.[6]

  <u>See</u> Docket Entry Nos. 15, 16, 17 and 19.  By a subsequent court-approved Stipulation, the

  deadline for objections to discharge was further extended to July 9, 2007.  <u>See</u> Docket

  Entry Nos. 24, 25.

28. The Chapter 7 Trustee also sought leave to employ Michael H. Kaliner, Esquire as Trustee's

  Counsel to investigate the asset transfers discussed above.  Leave was granted by court

---

[5] The Debtor did not explain the relationship between his testimony that he worked in "carry-out" restaurants as an employee and his written disclosure that he operated a small business.  The evidence is not necessary conflicting.  The Debtor easily could have been engaged in the two (2) activities serially or simultaneously.  To resolve the Motion, I find it unnecessary to delve further into the subject.

[6] In the April 6th motion, the Chapter 7 Trustee claimed that the Debtor's Amended SOFA disclosure was made only after the Debtor had already verified the accuracy of his initially-filed schedules at the first §341 meeting of creditors held on February 7, 2007.  At the August 27, 2008 hearing, the Debtor testified that he had no present recollection of the §341 hearing.  The Chapter 7 Trustee neither testified at the hearing nor introduced into evidence a recording or transcript of the §341 meeting.  Therefore, there is nothing in the evidentiary record to support the Chapter 7 Trustee's allegation regarding the Debtor's §341 hearing testimony.

order dated May 31, 2007.  See Docket Entry No. 22.

**The Chapter 13 Phase of the Case**

29.  On July 5, 2007, the Debtor filed a motion to convert his chapter 7 bankruptcy case to one

under chapter 13.  See Docket Entry No. 27.

30.  The court entered an Order converting the case from chapter 7 to chapter 13 on July 6,

2007.  See Docket Entry No. 29.  On that same day, the Chapter 7 Trustee was removed

and William C. Miller was appointed as Chapter 13 trustee ("the Chapter 13 Trustee").[7]

31.  On July 31, 2007, the Debtor filed an Amended Schedule I, declaring that the Debtor's

monthly income now totaled $2,245.00, consisting of:  $1,001.00 in Social Security

disability benefits, $494.00 in Supplemental Security Income benefits for his children, and

$750.00 from Mrs. Jabarin's rental income.  See Docket Entry No. 31.

32.  On July 31, 2007, the Debtor also filed an Amended Schedule J, disclosing $1,960.00 in

monthly living expenses for him and his family.[8]  See Docket Entry No. 32.

33.  Between July and December, 2007, eleven (11) proofs of claim totaling $75,746.53 were

filed in the Debtor's bankruptcy case.  These claims generally range between $3,000.00 and

$8,000.00.  The smallest claim is for $449.00.  The largest was filed by Chase Bank U.S.A.,

---

[7]      The motion to convert to chapter 13 was filed four (4) days before the expiration of the
July 9, 2007 deadline for objections to discharge and the conversion order was entered three (3) days before
the deadline.  After the re-conversion of the case to chapter 7, see Finding of Fact No. 36, infra, the
Chapter 7 Trustee did not file an objection to discharge.

[8]      The Debtor's Amended Schedule I discloses the Debtor as being married with three (3)
children.  It omits any reference to his two oldest children.

N.A. and is for $25,603.67.[9]  See Exhibit T-2.

34. On November 21, 2007, the Chapter 13 Trustee filed a motion to dismiss the Debtor's

bankruptcy case, contending that the total amount of the proofs of claim exceeded the

funding of the Debtor's proposed chapter 13 plan.[10]  See Docket Entry No. 41.

35. On December 12, 2007, the Chapter 13 Trustee withdrew his motion to dismiss, see Docket

Entry No. 44, and on January 15, 2008, replaced it with a Motion to Reconvert Case to

Chapter 7 ("the Motion to Reconvert").  See Docket Entry No. 46.  In the Motion to

Reconvert, the Chapter 13 Trustee asserted that the Debtor was several months in arrears

on his chapter 13 plan payments and lacked adequate income to propose a feasible plan.  He

also contended that it was in the best interests of creditors and the estate if the case were

reconverted back to a chapter 7 because there were assets potentially available for

liquidation and distribution to unsecured creditors.  See id.


**The Reconversion of the Case to Chapter 7**

36. The Chapter 13 Trustee's Motion to Reconvert was granted as unopposed on January 22,

2008.  See Docket Entry No. 52.

37. Subsequently, Arthur P. Liebersohn was again appointed Chapter 7 Trustee and an Order

---

[9]       A notice of transfer of the Chase Bank U.S.A. N.A. claim to B-Real, LLC was filed on
May 8, 2008.

[10]       It appears that the Chapter 13 Trustee's Motion to Dismiss was more in the nature of an
objection to confirmation combined with a motion to dismiss.  See generally In re Orawsky, 387 B.R. 128,
136-37 (Bankr. E.D .Pa. 2008) (discussing practice of the Chapter 13 Trustee of filing motions to dismiss
case based on perceived defects in the debtor's proposed chapter 13 plan).

was entered granting his application to re-employ Michael Kaliner, Esquire as counsel to

assist in investigating and attempting to recover certain of the Debtor's prepetition asset

transfers.  See Docket Entry Nos. 54, 57.

38.    On February 28, 2008, the Debtor filed the Motion to Dismiss.  See Docket Entry No. 63.

39.    To date, no objections to discharge, objections to exemptions or avoidance actions have

been filed in this case.


**The Debtor's Current Financial Status and Good Faith**

40.    The Debtor did not purposely omit disclosure of the August 2, 2005 transfer of the Virginia

Property from the original SOFA.  Rather, the nondisclosure was a result of difficulties in

communications between the Debtor and his counsel.[11]

41.    The first conversion of the case (from chapter 7 to chapter 13) was motivated by the

Debtor's sincere, subjective belief that he could fund a confirmable chapter 13 plan and was

in good faith.[12]

---

[11]    I credit the Debtor's testimony on this point.


[12]    In his Memorandum of Law in Opposition to the Debtor's Motion, the Chapter 7 Trustee charged that the Debtor "engaged in unreasonable delay by converting the previously filed Chapter 7 case to one under Chapter 13 in order to avoid the [Chapter 7] Trustee pursuing avoidance actions, while at the same time knowing that he did not have the ability to propose a feasible Plan."  Chapter 7 Trustee's Mem. of Law at 1.  He also complained that "[w]hen the Chapter 13 Trustee filed a Motion to Dismiss, the Debtor failed to notify the Chapter 7 Trustee; instead the Chapter 7 Trustee interceded and had the Chapter 13 Trustee file a Motion to Convert Case."  Id.  The Debtor contended that a change in financial circumstances, i.e., his receipt of an award of social security disability, caused him to believe that he could fund a chapter 13 plan.  Debtor's Motion ¶8; Debtor's Mem. at 1.  At the evidentiary hearing, the Chapter 7 Trustee introduced no evidence in support of his theory, perhaps expecting that I would draw an inference from the evidence that the Debtor's conduct evinced an improper intent to subvert the functioning of bankruptcy the system.

10

42.    The Debtor's monthly income, as of August 27, 2008, the date of the evidentiary hearing on

the Motion, was insufficient to meet his and his family's regular monthly living expenses.[13]

43.    If this case were dismissed, it is unlikely that the Debtor would have sufficient income to

meet any payment arrangements that he might attempt to make with his creditors.


### III.  DISCUSSION

### A.  Legal Principles Governing Motions to Voluntarily Dismiss Under 11 U.S.C. §707(a)

### 1.

Section 707(a) of the Bankruptcy Code provides that the court may dismiss a chapter 7

case "only after notice and a hearing and only for cause. . . ."  11 U.S.C. §707(a) (emphasis

added).  Although the Code does not expressly address whether §707(a) applies to a debtor

seeking voluntary dismissal of his own petition, "courts have found that chapter 7 debtors may

---

Having considered the evidence presented at the hearing and observed the Debtor's demeanor, I decline to draw that inference.  I accept the Debtor's claim that the conversion was subjectively in good faith.  Further, I find that there was an objectively reasonable basis for the Debtor to invoke chapter 13.  The Debtor's rehabilitation theory was: (1) he believed that he had sufficient disposable income to make some, finite distribution to unsecured creditors; and (2) depending upon the amount of allowed unsecured claims, the available disposable income might be sufficient to pay all allowed claims in full and obviate the need for potential transfer avoidance proceedings with respect to the Debtor's prepetition transfers to his family.  After it became clear that the amount of the allowed claims exceeded the Debtor's ability to fund the plan, the Debtor acquiesced to reconversion of the case to chapter 7.  However, the fact that the rehabilitation effort was unsuccessful does not dictate the conclusion that the attempt was made in bad faith.


[13]      At the hearing, the Debtor testified that his income is consistent with the disclosures in Amended Schedule I.  However, I find that the Debtor understated his expenses in Amended Schedule J and that his monthly living expenses for himself and his dependent family members exceed the disclosed household monthly income of $2,245.00.

move for voluntary dismissal under this section." In re Hopkins, 261 B.R. 822, 823 (Bankr. E.D. Pa. 2001); see also In re Smith, 507 F.3d 64, 72 (2d Cir. 2007); In re Turpen, 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000); In re Watkins, 229 B.R. 907, 909 (Bankr. N.D. Ill. 1999). Thus, courts frequently observe that while a chapter 7 debtor may choose to place himself or herself in bankruptcy voluntarily, the debtor does not enjoy the same freedom to withdraw the bankruptcy case as of right once it has been commenced. See, e.g., In re Boyce, 2006 WL 3061633, at *3 (E.D. Pa. Oct. 26, 2006); In re Strunk, 2008 WL 1994848, at *1 n.4 (Bankr. E.D. Pa. May 8, 2008); In re Aupperle, 352 B.R. 43, 45 (Bankr. D.N.J. 2005).

To dismiss a chapter 7 case voluntarily, "the debtor has the burden of demonstrating sufficient cause." In re Boyce, 2006 WL 3061633, at *3; accord In re Cohara, 324 B.R. 24, 27-29 (B.A.P. 6th Cir. 2005); In re Turpen, 244 B.R. at 434. Determining whether sufficient cause exists is committed to the sound discretion of the bankruptcy court. In re Boyce, 2006 WL 3061633, at *4; In re Heatley, 51 B.R. 518, 519 (Bankr. E.D. Pa. 1985).


## 2.

Cause is not defined in 11 U.S.C. §707(a). Courts have formulated various standards for determining whether there are grounds for the voluntary dismissal of a chapter 7 case. One court that surveyed the law in this area has suggested that there are three (3) different lines of cases under §707(a). See In re Cochener, 382 B.R. 311, 334 (S.D. Tex. 2007).

The first line of cases holds that there can be no dismissal under §707(a) "if there is any showing of prejudice to creditors." In re Hopkins, 261 B.R. at 823 (quoting In re Turpen, 244 B.R. at 434 (citations omitted)); accord In re Achey, 2002 WL 539036, at *1 (Bankr. N.D. Iowa

Apr. 8, 2002); In re Haney, 241 B.R. 430, 432 (Bankr. E.D. Ark. 1999); In re Harker, 181 B.R. 326, 328 (Bankr. E.D. Tenn. 1995). This expression of the test implies that any prejudice to creditors is an absolute bar to voluntary dismissal, no matter how compelling the reasons for the debtor's request for voluntary dismissal.

Another line of cases holds that "the test [for cause] turns on whether or not the dismissal is in the best interests of the debtor and the creditors of the estate . . . with particular emphasis on whether the dismissal would be prejudicial to creditors." In re Strunk, 2008 WL 1994848 at *1 n.4 (quoting In re Aupperle, 352 B.R. at 46). Courts adhering to this line of cases apply what may be characterized as a balancing of interests test. See, e.g., In re McDaniel, 363 B.R. 239, 245 (M.D. Fla. 2007); accord Matter of Atlas Supply Corp., 857 F.2d 1061, 1063 (5th Cir. 1988); In re Timmerman, 379 B.R. 838, 845 (Bankr. N.D. Iowa 2007); In re Williams, 305 B.R. 618, 620 (Bankr. D. Conn. 2004); Matter of Churchill, 178 B.R. 478, 479 (Bankr. D. Neb. 1995); In re Heatley, 51 B.R. at 519-20. A "[d]ebtor's interest lies in securing a fresh start while [a] creditor's interest concerns the prejudice and delay encountered in pursuing its claim." In re MacDonald, 73 B.R. 254, 256 (Bankr. N.D. Ohio 1987); see also Smith, 507 F.3d at 72; In re Hull, 339 B.R. 304, 307-08 (Bankr. E.D.N.Y. 2006); In re Watkins, 229 B.R. at 909; In re Schwartz, 58 B.R. 923, 925 (Bankr. S.D.N.Y. 1986).

Finally, in a third line of cases, dismissal is granted freely unless it will cause "plain legal prejudice" to creditors.[14] Plain legal prejudice has been described as "prejudice that is significant

---

[14]    In re Hall, 15 B.R. 913, 917 (B.A.P. 9th Cir. 1981) (holding the "plain legal prejudice" test applies to voluntary dismissal under the Code) (cited with approval in In re Ditter, 13 Fed. Appx. 686 (9th Cir. 2001)); In re McCullough, 229 B.R. 374, 376 (Bankr. E.D. Va. 1999); In re Komyathy, 142 B.R. 755, 757 (Bankr. E.D. Va. 1992); In re Higbee, 58 B.R. 71, 72 (Bankr. C.D. Ill. 1986); see also In re Int'l Airport Inn P'ship, 517 F.2d 510, 511 (9th Cir.1975) (adopting "plain legal prejudice" test for voluntary

and real, not potential, when viewed in terms of the rights that debtors and creditors have after dismissal." In re Cochener, 382 B.R. at 334 (collecting cases). From the debtor's perspective, the "plain legal prejudice" test is the most hospitable standard. It appears to set the bar for opposing dismissal at the highest level among the three tests because it requires demonstrable prejudice and rules out potential prejudice[15] as a basis for denying the motion.

In practice, the three (3) lines of cases described above may not be as distinct as their stated tests may make them appear. For example, courts that purport to employ the "absolutist" approach of the "any prejudice" test in the first line of cases as well as courts that "balance" the interests of the debtor and the creditors may consider the same "factors" in ruling on a voluntary motion to dismiss under §707(a), such as:

1. whether all of the creditors have consented;

2. whether the debtor is acting in good faith;

3. whether dismissal would result in a prejudicial delay in payment;

4. whether dismissal would result in a reordering of priorities;

5. whether there is another proceeding through which the payment of claims can be handled;

6. whether an objection to discharge, an objection to exemptions, or a preference claim is pending.

See In re Timmerman, 379 B.R. at 845; In re Maixner, 288 B.R. 815, 817 (B.A.P. 8th Cir. 2003);

---

dismissal of cases under the prior Bankruptcy Act).

[15]    See In re Williams, 305 B.R. at 621-22 (assessing potential prejudice to creditors and debtor in denying voluntary motion to dismiss); In re Carroll, 24 B.R. 83, 87 (Bankr. N.D. Ohio 1982) (same).

In re Cink, 2007 WL 601585, at *2 (Bankr. D.S.D. Feb. 21. 2007); In re Fultz, 2004 WL 451258,

at *1 (Bankr. N.D. Fla. Feb. 13, 2004); ; In re Terry, 2003 WL 21219818, at *1 (Bankr.

M.D.N.C. May 23, 2003).  Even courts that favor the "plain legal prejudice" test may slide into

consideration of multiple "factors" in assessing voluntary motions to dismiss under §707(a).  See

In re Hickman, 384 B.R. 832, 840 (B.A.P. 9th Cir. 2008) ("the totality of the circumstances"

should be considered in evaluating cause for dismissal and plain legal prejudice); In re Branisel,

130 B.R. 502, 503-04 (Bankr. N.D. Ohio 1991) (referring to plain legal prejudice test, but also

stating that interests of both debtor and creditors must be considered).[16]

Thus, while in the abstract, these three (3) lines of cases articulate a different legal standard

for voluntary dismissal under §707(a), all of the courts may be employing, at bottom, the same

---

[16]    Hickman and Branisel notwithstanding, it appears to me that there is a meaningful
difference between the "plain legal prejudice" standard and the other standards – at least in theory.
Consider the case of a debtor who has numerous unsecured creditors, all of whom hold relatively modest
claims.  If the debtor seeks dismissal at a time when no statutes of limitations have run on the creditors'
respective claims or on potential state law transfer avoidance claims, it is difficult to see how the creditors
would be "legally prejudiced" by dismissal of the bankruptcy case.  However, as a practical matter, it may
appear to the bankruptcy court that no one creditor likely has a sufficient economic incentive to pursue
collection efforts in state court while the trustee, acting on behalf of combined creditor body, is prepared to
do so.  In these circumstances, at least some courts may find, based on their experienced intuition regarding
the likely practical detriment that dismissal will have on creditors, that there is "prejudice" sufficient to
deny a motion to dismiss under §707(a).  Perhaps the question lurking below the surface is whether
prejudice is measured by the effect of dismissal on each individual creditor or on the creditor constituency
as a whole.

A variation of this issue arises if the debtor's debt structure is such that only one creditor
likely has the incentive to pursue collection efforts and, if successful, that creditor will collect all of the
debtor's non-exempt assets (or all of the assets recovered in set-aside transfers) solely on its own behalf,
while if the bankruptcy trustee were to pursue the debtor's assets or available transfer avoidance actions
successfully, there could be a pro rata distribution among all creditors.  Again, guided by the fundamental
bankruptcy policy of "equality of distribution among creditors," some courts might perceive "prejudice" to
the creditor "constituency" in such a situation.

analysis – a factually intensive assessment of the debtor's reasons for requesting dismissal and of the impact dismissal can be expected to have on the creditors.  Such an approach is susceptible to being labeled a balancing test.  I adopt a balancing of interests approach because I conclude that it affords bankruptcy courts the flexibility needed to make the equitable determination whether there is "cause" for a voluntary dismissal under §707(a).[17]  See generally McDaniel, 363 B.R. at 245 (bankruptcy court "must  . . . undertake fact-sensitive inquiry that is guided by equitable considerations, which balances the benefit and harm to creditor and debtor alike"); In re Anderson, 373 B.R. 781, 783 (Bankr. S.D. Ga. 2006) (referring to dismissal under §707(a) as requiring a balancing of "the equities and consider[ation of] the benefits and prejudice of dismissal") (quoting In re Johnson, 318 B.R. 907, 912 (Bankr. N.D. Ga. 2005)).[18]

**3.**

---

[17]    I conclude that, if applied literally, requiring the objecting party to establish "plain legal prejudice" is too strict a standard.  Rather, given the bankruptcy court's historic role as a court of equity, see In re Padilla, 389 B.R. 409, 429 (Bankr. E.D. Pa. 2008), a more flexible concept of prejudice is appropriate in evaluating the propriety of a request for voluntary dismissal under §707(a).  As discussed in the text above, I conceptualize the ultimate decision concerning whether there is "cause" for dismissal as a balancing test in which the court will consider various relevant factors and assess the likely effect of dismissal or non-dismissal on both the debtor and creditors.

[18]    Accordingly, I reject the Debtor's urging that I follow In re Geller, 74 B.R. 685 (Bankr. E.D. Pa. 1987) and interpret it as authority for the proposition that a "debtor's request for voluntary dismissal of the Chapter 7 case should be granted in all but extraordinary circumstances."  Debtor's Mem. at 2 (Docket Entry No. 71).  I do not read Geller quite so expansively.  Like many reported cases, Geller is something of a hybrid.  The Geller court invoked the "plain legal prejudice" test, but then stated that a balancing test should be employed, weighing any plain legal prejudice that may exist against the prejudice the debtor would suffer if the case were not dismissed.  Id. at 690.  To the extent, if any, that Geller goes beyond balancing the parties' respective interests and purports to establish a less restrictive standard for voluntary dismissal (i.e., "in all but extraordinary circumstances"), it is not consistent with the substantial body of case law that has developed under §707(a) for assessing voluntary motions to dismiss chapter 7 bankruptcy cases since 1987 and I decline to follow it.

16

To conclude that the determination of whether "cause" exists is discretionary and involves consideration of a variety of factors advances the analysis only so far. Where "the rubber meets the road" in §707(a) voluntary dismissal cases is in how the court weighs the competing factors. In this respect, two (2) factors tend to recur as important in the courts' ultimate conclusions on whether to grant §707(a) voluntary motion to dismiss.

The first is "good faith." Only a debtor who has acted in good faith is permitted to voluntarily dismiss a chapter 7 case. Of course, inquiries into a debtor's good faith are made in a variety of contexts in bankruptcy cases – e.g., with respect to the filing of the case itself[19] and in confirming rehabilitation and reorganization plans.[20] Limiting voluntary dismissal to debtors who are acting in good faith simply may be an example of the general principle that courts do not reward anyone who is trying to manipulate the court system. Bankruptcy courts are vigilant in attempting to protect the bankruptcy system from parties who seek to manipulate the process or otherwise act in bad faith. Debtor requests for voluntary dismissal of chapter 7 cases may heighten these concerns due, in part, to the sequence of the debtor invoking the bankruptcy process and later requesting termination of the process after having already reaped the benefit from the automatic stay, 11 U.S.C. §362(a). Whatever the precise explanation may be, courts are keenly sensitive to any indicia of bad faith conduct by the debtor in evaluating voluntary motions to dismiss under §707(a). See, e.g., In re Tanguay, 206 B.R. 575, 577 (M.D. Fla. 1997); In re Strunk, 2008 WL 1994848, at *1 n.4; In re McDaniel, 363 B.R. at 244.

---

[19]    In re Tamecki, 229 F.3d 205 (3d Cir. 2000) (chapter 7); In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (chapter 13).

[20]    11 U.S.C. §1129(a)(3); id. §1325(a)(3).

The second factor is "prejudice."  Various questions arise regarding how to define and measure "prejudice", such as:  Can the mere pendency of a bankruptcy case (before its dismissal) and concurrent pendency of the automatic stay, without more, be considered inherently "prejudicial" to creditors and, as such, grounds for denying a voluntary motion to dismiss?[21]  If so, how long must a case be pending before the resulting delay in seeking nonbankruptcy-related remedies is prejudicial?  What weight, if any, should be given to a debtor's proposed plan for voluntarily paying creditors outside of bankruptcy?[22]  May the loss of a motivated fiduciary (i.e., the chapter 7 trustee) and a single forum for all creditors be considered "prejudice"?[23]

While these questions may inform the §707(a) inquiry into whether "cause" exists for voluntary dismissal, they are questions that are not best answered in the abstract.  Rather, they should be resolved on a case-by-case basis in the context of the specific facts presented.[24]

---

[21]     See Komyathy, 142 B.R. at 757-58; Schwartz, 58 B.R. at 925.

[22]     See Smith, 507 F.3d at 73; Cohara, 324 B.R. at 29;  In re Bartee, 317 B.R. 362, 366 (B.A.P. 9th Cir. 2004); Cink, 2007 WL 601585, at *2; In re Simmons, 2006 WL 3392943, *2 (Bankr. M.D.N.C. Nov. 22. 2006); In re Williams, 305 B.R. at 620-21; In re Wilde, 160 B.R. 625, 626-27 (Bankr. W.D. Mo. 1993).  Related issues include: Will the proposed adjustment of the outstanding debts outside the bankruptcy case benefit creditors by being more prompt or providing a greater return?  Is there a greater risk of nonpayment to creditors outside the bankruptcy environment and, if so, what degree of risk is involved?  If there is a greater risk to creditors outside of the bankruptcy process, how does that risk compare to the alleged benefits the debtor expects to obtain from dismissal?

[23]     See Anderson, 373 B.R. at 785; In re Fulton, 339 B.R. 698, 701 (Bankr. N.D. Iowa 2006); Komyathy, 142 B.R. at 757.

[24]     In this respect, deciding whether "cause" exists under §707(a) is similar to the determination bankruptcy courts make in a variety of contexts whether the debtor is acting in "good faith."  See generally In re Glunk, 342 B.R. 717, 731-32 (Bankr. E.D. Pa. 2006) (discussing various jurisprudential concerns in making determinations based on "totality of circumstances" test and observing that such determinations may constitute a form of factfinding in which consideration of precedent may not play a significant role in the decisionmaking process).

With the general principles discussed above in mind, I turn to the Debtor's request for voluntary dismissal.

## B.  Dismissal Would Unduly Prejudice the Unsecured Creditors

### 1.

The Debtor asserts that the "cause" for dismissing this case is that he made a mistake in filing for bankruptcy.  Due to confusion caused by language differences, the Debtor did not disclose the transfers discussed above.  <u>See</u> Finding of Fact No. 42.  He contends that, had he understood his bankruptcy counsel's questions[25] and disclosed these transfers, he would have learned of the risks associated with filing for bankruptcy-- such as potentially losing assets he had allocated for his wife and children -- and, consequently, would never have filed the case. Although the Debtor expressed a general desire and intention of paying his creditors after the requested dismissal of this case, he has no concrete plan for dealing with his creditors outside of bankruptcy.  Thus, what appears more likely is that if this case were dismissed, the Debtor simply would remain open to all creditor collection remedies that exist under applicable nonbankruptcy law (as his counsel observed during oral argument on April 2, 2008).

The Chapter 7 Trustee and the UST argue that the Debtor cannot meet his burden of establishing cause because of the undue prejudice the Debtor's creditors would incur if this case were dismissed.  They observe that creditors have had their hands tied and collection efforts restrained by the automatic stay for well over one (1) year.  They speculate that the statute of

---

[25]      The Debtor testified that he understood his bankruptcy counsel's questions regarding any prepetition sales of "real estate" to encompass only sales of land and not to encompass the sale of the Virginia Property.

19

limitations may have run on certain creditors' claims.  They accuse the Debtor of having engaged in procedural wrangling through conversion and re-conversion of his bankruptcy case and having caused undue delay following the disclosure of the prepetition real estate sale and other asset transfers.  They point out that the Debtor has limited income, no intention or ability to repay his creditors voluntarily outside of bankruptcy and no intention to undo the alleged fraudulent transfers.  Finally, they assert that the bankruptcy process would provide an orderly process for distributing any assets the Chapter 7 Trustee recovers and that the creditors would be prejudiced by dismissal because they would have to start from scratch with respect to the collection of their debts, investigate the Debtor's asset transfers and race to the courthouse to obtain judgments and/or challenge the Debtor's transfers.

After: (1) evaluating the Debtor's stated rationale for seeking dismissal of this case; (2) resolving the disputes regarding good faith in the Debtor's favor, and (3) considering the competing interests of the creditors, I conclude that the balance tips in favor of the creditors and against dismissal because dismissal at this juncture would unduly prejudice creditors.

## 2.

The Debtor seeks dismissal of his bankruptcy case because the Chapter 7 Trustee has targeted assets that may provide a source of distribution to creditors who might otherwise expect to receive nothing.  From the Debtor's perspective, it appears that the benefit of dismissal is the restoration of the status quo before the bankruptcy, the removal of a motivated bankruptcy trustee and the realistic probability that no creditor's claim is large enough to make it financially feasible or rewarding for it to seek to set aside the Debtor's prepetition transfers in another court

of competent jurisdiction.  In other words, because he perceives himself to be "judgment proof," the Debtor wishes to trade away his discharge in return for the possibility that creditors will not be motivated to attack his asset transfers outside of bankruptcy court.

In these circumstances, the prejudice to the unsecured creditor constituency is palpable.  In light of the Debtor's lack of present income, his age and his disability, the assets the Chapter 7 Trustee proposes to attempt to recover appear to represent the creditors' best opportunity for obtaining satisfaction of their claims.[26]  Indeed, although the Debtor does not lay it out in these terms, he essentially seeks a dismissal to permit him to gamble on his assumption that dismissal will prejudice his creditors and hence, permit his wife and children to retain the assets he transferred to them.

One court has observed that "[t]he discovery of assets is not cause to dismiss" a bankruptcy case, but rather, "[i]f anything, . . . is grounds for retaining jurisdiction, i.e., that creditors who perhaps expected to recover nothing on their claims may be assured of an equitable and full distribution of the debtor's newly discovered assets."  In re Baumgarten, 154 B.R. 66, 69 (Bankr. S.D. Ohio 1993) (citing In re Williams, 15 B.R. 655 (E.D. Mo. 1981), aff'd, 696 F.2d 999 (8th Cir. 1982) (Table) and In re Blackmon, 3 B.R. 167 (Bankr. S.D. Ohio 1980)).  That the intended use of the discovered assets is the support of the debtor's family does not alter this general principle.  See In re Cink, 2007 WL 601585 at *3 (the "[d]ebtor's desire to preserve

---

[26]    I recognize that there is a risk, even if this case proceeds in bankruptcy, that the Chapter 7 Trustee's efforts to avoid the Debtor's allegedly fraudulent transfers may not be successful and that the Debtor might still obtain his discharge.  Nonetheless, given the relative dollar value of the claims the Debtor's individual creditors have asserted in his bankruptcy and the reasonably likely scenario that would follow from dismissal of the bankruptcy case, I have no doubt that the completion of this bankruptcy case is in the creditors' collective best interests.  The Debtor's creditors are entitled to assert that the assets the Debtor transferred to his wife and children are recoverable as fraudulent transfers and that is what the Chapter 7 Trustee was poised to do when the Debtor filed the Motion.

family property does not constitute cause for dismissal").  In the circumstances presented here, I agree with these propositions.

Significantly, this is not a case in which the Debtor proposes to offset or ameliorate the prejudice to the creditors by establishing a non-bankruptcy plan for addressing their claims.  As the Debtor seeks to terminate the potential bankruptcy administration of the transferred assets, he has not presented any credible or viable plan for paying his creditors outside of bankruptcy.  His suggestion that he will try to make some arrangements with them is belied by his undisputed limited income and resources.  Cf. In re Cohara, 324 B.R. at 29 (reversing bankruptcy court decision granting debtor's motion to dismiss where debtor failed to present a detailed plan concerning how she would use her non-exempt income-producing settlement annuity that trustee sought to administer to pay creditors outside of bankruptcy).  In these circumstances, the balance of competing interests tips in favor of the creditors.

## IV.

In sum, in the circumstances presented, I find that sending creditors back to their state remedies to fend for themselves at this point would be unduly prejudicial.  Accordingly, I will enter an Order denying the Debtor's Motion to Dismiss.

Date:   October 15, 2008   

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**